IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| JIM FRANKLIN DURHAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:09-CV-004 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 8] will be granted, and plaintiff's motion for summary judgment [doc. 6] will be denied.

I.

*Procedural History*

Plaintiff was born in 1958. He applied for benefits in May 2006, claiming to be disabled as of October 29, 2001, by osteoporosis, arthritis, and fibromyalgia. [Tr. 59, 74]. His insured status expired on December 31, 2004 [Tr. 64-65], and he must prove the onset of disability on or before that date. *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

Plaintiff's application was denied initially and on reconsideration. He then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in March 2008.

By decision dated April 3, 2008, the ALJ denied benefits. He concluded that plaintiff suffers from fibromyalgia and osteoporosis, which are "severe" impairments but not in plaintiff's case equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 14, 16]. The ALJ further concluded that, as of the date last insured, plaintiff retained the residual functional capacity ("RFC") to return to his past relevant work. [Tr. 17-18]. Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought, and was denied, review by the Commissioner's Appeals Council, notwithstanding the submission and consideration of additional medical records. [Tr. 1, 4, 389-410].[1] The ALJ's ruling became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

---

[1] Plaintiff's briefing makes one citation to these additional medical records. "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). This court can, however, remand a case for further administrative proceedings, but only if the claimant shows that her evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). *Id.* Despite his single citation to the Appeals Council evidence, plaintiff's briefing to this court makes no effort to articulate how that evidence warrants sentence six remand, nor is sentence six even addressed in his brief. The issue is accordingly waived, and plaintiff's additional medical evidence [Tr. 389-410] has *not* been considered by this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

## II.

*Applicable Legal Standards*

Review of the Commissioner's decision is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof during the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id*.

4

III.

*Background*

Plaintiff alleges that since at least 1999 he has "gradually gone downhill" due to "terrible" muscle pain and fatigue. [Tr. 38-39]. In June 2006, he told the Commissioner that his pain began in 1992, has increased over time, and has become (as of June 2006) constant. [Tr. 89-90].

Plaintiff's past relevant employment is as a merchandiser and as a warehouse manager. [Tr. 81]. Plaintiff initially told the Commissioner that he stopped working in 1999 because, "I could not perform the job duties expected of me anymore, was taking more medications and it was hard to drive and do other things." [Tr. 74-75]. However, at his administrative hearing, plaintiff testified that he actually stopped working in 1999 due to a layoff. [Tr. 37-38]. Although his federal earnings statements show no reported income after 1999 [Tr. 67], the record elsewhere indicates that plaintiff continued to perform at least part-time work through September 2003. [Tr. 191, 193, 199, 341].

In the autumn of 2006, plaintiff told the Commissioner, "My ability to do anything is gone." [Tr. 108-09]. However, as of the 2008 administrative hearing, plaintiff remained able to drive, shop, attend church weekly, and care for his four dogs. [Tr. 39-41].

5

## IV.

### *Relevant Medical Records*

Six weeks after his alleged disability onset date, plaintiff was evaluated by Dr. Emily Diltz due to complaints of "severe weakness accompanied by some atypical chest discomforts." [Tr. 308]. Dr. Diltz described plaintiff as "a well-developed gentleman who appeared to be in no acute distress." [Tr. 308]. Dr. Diltz advised plaintiff to discontinue his two pack per-day smoking habit. [Tr. 307, 309]. A chest x-ray was unremarkable, but an electrocardiogram indicated a slowed heartbeat. [Tr. 308].

Plaintiff was diagnosed with low bone density in 1995. [Tr. 160, 175]. A June 2001 MRI showed mild degeneration in both hips. [Tr. 355]. Beginning in 1999, plaintiff was treated by Dr. Kevin Bailey due to complaints of bone pain. [Tr. 348]. Due to concerns over plaintiff "running out of medicine" [Tr. 341], Dr. Bailey in August 2001 wrote, "<u>I will not give him extra</u>. I will no longer write the oxycontin [prescriptions] in any fashion . . . ." [Tr. 336] (emphasis in original). The following month, plaintiff wanted referral to a different doctor, and Dr. Bailey referred him to a pain management clinic. [Tr. 336].

Plaintiff began a treatment relationship with Tennessee Valley Integrative Pain Center ("Pain Center") in October 2001. He rated his pain as high as 8 out of ten and complained of interrupted sleep. [Tr. 181]. Plaintiff reported slightly reduced pain the following month. [Tr. 180].

6

2002 Pain Center records show plaintiff's self-reports of pain ranging from 3 out of ten to 6 out of ten, and sleep ranging from "poor" to "okay." [Tr. 195-202]. On July 5, 2002, the physician recorded plaintiff's report that he was still working. [Tr. 199]. On August 30, 2002, plaintiff rated his pain as 6 out of ten but stated that the pain was "tolerable." [Tr. 198].

2003 Pain Center records show plaintiff's self-reports of pain ranging from 5 out of ten to 7 out of ten, and sleep ranging from "fair" to "poor." [Tr. 191-94]. On June 5, 2003, the Pain Center recorded plaintiff's report that he was still working. [Tr. 193]. On September 24, 2003, the Pain Center described plaintiff as "pain focused" but again wrote that he was still working. [Tr. 191].

2004 Pain Center records show plaintiff's self-reports of pain ranging from 3 out of ten to 5 out of ten, and sleep ranging from "horrible" to "better." [Tr. 222, 225-27]. In June 2004, plaintiff reported daily activities including yard work and "light construction." [Tr. 227]. A December 1, 2004 bilateral hip MRI showed "some marginal osteophytes" and "[s]ome arthritic changes" in the hips. [Tr. 223]. On December 15, 2004, the Pain Center described plaintiff as "stable" and "feel[ing] better." [Tr. 222].

In the first half of 2005, Pain Center records show plaintiff's self-reports of pain ranging from 2 out of ten to 4 out of ten, and sleep ranging from "poor" to usually "good." [Tr. 216-21]. On March 9, 2005, plaintiff reported that he had experienced a "[b]ad month for pain," and he planned to begin aquatic therapy in the next few weeks. [Tr. 220].

7

On April 6, 2005, plaintiff reported minimal pain, good sleep, and increased daily activities including yard work. [Tr. 219]. That report was repeated at his May 2005 appointment, and plaintiff was also engaged in "remodeling" at that time. [Tr. 218]. On September 2, 2005, plaintiff was treated at a hospital emergency room for "a 7-10 day complaint of weakness, fatigue, near-syncope, and chest pain." [Tr. 132].

An undated Pain Center appointment report, from sometime between 2002 and 2006, notes that plaintiff was performing yard work and "doing more lately." [Tr. 187]. He was described as "a little upset" that he was not allowed to reschedule his appointment so he could "accompany wife on vacation." [Tr. 187].

Nonexamining Dr. Frank Pennington completed a Physical RFC Assessment form in March 2007. Dr. Pennington reviewed the existing medical record up to plaintiff's date last insured. [Tr. 244]. Dr. Pennington opined that, as of December 31, 2004, plaintiff was able to work at the medium level of exertion without further restriction. [Tr. 237-44].

Dr. Samuel Breeding performed a physical examination and file review in March 2008. Although the administrative record makes clear that plaintiff continued to work through at least September 2003, he told Dr. Breeding that he became "unable to work due to his symptoms at around the beginning of the year 2000." [Tr. 386-87].

On examination, plaintiff had nearly full muscle strength in all groups but simultaneously had diffuse tenderness throughout. [Tr. 387]. Dr. Breeding diagnosed "fibromyalgia-like pain syndrome," osteoporosis, and osteoarthritis. [Tr. 388]. He assessed

8

vocational limitations far more restrictive than those opined by Dr. Pennington, but the restrictions were phrased in the present tense and thus clearly referred to plaintiff's capacities as of March 2008. [Tr. 388]. Dr. Breeding added, "It is my medical opinion from reviewing the medical records that he was disabled between 20 October 2001 and 31 December 2004 and that he has continued to be disabled to this date." [Tr. 388].

V.

*Analysis*

The ALJ adopted Dr. Pennington's assessment rather than Dr. Breeding's. [Tr. 15-17]. "Specifically," plaintiff argues on appeal that "the ALJ improperly rejected restrictions assessed by Dr. Breeding and did not provide good reasons to do so," and that the ALJ "offer[ed] no rationale" whatsoever. In addition, plaintiff contends that the ALJ "not only improperly rejected the claimant's credibility, but also failed to articulate his reasoning process" supporting that rejection. On both of these points, plaintiff misreads the ALJ's decision.[2]

First, the ALJ did not err in rejecting Dr. Breeding's summary conclusion that plaintiff is "disabled." The ultimate question of disability is reserved to the Commissioner, not the physician. *See* 20 C.F.R. § 404.1527(e)(1).

---

[2] These are the only two challenges raised in plaintiff's brief. All other issues are accordingly waived. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("we decline to formulate arguments on [plaintiff's] behalf, or to undertake an open-ended review of the entirety of the administrative record . . . . Rather, we limit our consideration to the particular points that [plaintiff] appears to raise in her brief on appeal.").

Because Dr. Breeding personally examined plaintiff and Dr. Pennington did not, Dr. Breeding's opinion would generally be entitled to greater weight, *see* 20 C.F.R. § 404.1527(d)(1), even though each physician's conclusions regarding the time period at issue in this case were essentially based on a file review. [Tr. 32, 388]. Nonetheless, an ALJ may instead credit the opinion of a nonexamining source such as Dr. Pennington if adequate reasons are provided in the ALJ's decision. *See* 20 C.F.R. § 404.1527(f)(2)(ii).

Adequate reasons were provided in this case. The ALJ explained that he rejected Dr. Breeding's assessment in part because it was generated "well over three years after the claimant's date last insured had expired." [Tr. 17]. More specifically, the ALJ found Dr. Breeding's opinion to be "inconsistent with the documentary evidence of record" and "based on the claimant's subjective complaints rather than on objective medical findings[.]" [Tr. 16].

As cited above, prior to his date last insured, plaintiff remained far more active than he would have the Commissioner, Dr. Breeding, or this court believe. The record shows that he continued working (in some unaccounted-for capacity) through at least September 2003, yet he has concealed that fact both from the Commissioner and Dr. Breeding. Prior to, and after, his date last insured, plaintiff remained able to drive, shop, care for four dogs, perform yard work and light construction, attend church, and remodel - and he felt well enough to go on vacation but for a conflict with his Pain Center appointment. Consistent

10

with this activity level, plaintiff deemed his self-scored 6 out of ten pain "tolerable."[3]

The court recognizes that plaintiff's medical file contains a longstanding diagnosis of fibromyalgia. However, "a *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (emphasis in original) (citation and quotation omitted); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").

Typically, "fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). Instead, "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.* at 244.

This is not a case, as in *Rogers*, where the treating specialists "continually tested for and [the claimant] increasingly exhibited the medically-accepted and recognized signs of fibromyalgia." *Id.* The Pain Center records vaguely note "multiple points" of tenderness [Tr. 180-82, 195-97], and Dr. Breeding described "diffuse tenderness in all major

---

[3] The ALJ cited this activity level as grounds for not crediting plaintiff's statements and testimony. [Tr. 17]. Plaintiff's contention that the ALJ "improperly rejected [his] credibility [and] failed to articulate his reasoning process" is thus without merit.

11

muscle groups" [Tr. 387], but there is no evidence in the present record of any physician conducting the formal "testing of a series of focal points for tenderness and . . . the ruling out of other possible conditions through objective medical and clinical trials" as is seen in the most persuasively documented fibromyalgia cases. *See Rogers*, 486 F.3d at 244. Regardless, the ALJ took plaintiff's fibromyalgia-like complaints into account by restricting him (as of December 31, 2004) to no more than medium exertion, consistent with the opinion of Dr. Pennington.

Substantial evidence supports the rejection of Dr. Breeding's assessment as inconsistent with the remaining documentary evidence for the time period that is the subject of this claim. Dr. Breeding's conclusory statement that plaintiff was "disabled" during the relevant time period is insufficient. Dr. Breeding did not substantively relate his 2008 observations and conclusions back to the pre-December 2004 period - particularly in light of his own observation that plaintiff's condition has "worsen[ed] through the years." [Tr. 386]. Plaintiff's rather extraordinary delay in applying for benefits placed him in an evidentiary bind and did not make the ALJ's task an easy one. The ALJ nonetheless determined plaintiff's vocational capacities based on the evidence presented, and he adequately explained his conclusions.

Even if it were to be presumed that a different factfinder could have reached a different conclusion below, that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The substantial

12

evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted)

The Commissioner's final decision is adequately explained and is supported by substantial evidence. That decision must therefore be affirmed. An order consistent with this opinion will be entered.

ENTER:

<u>s/ Leon Jordan</u>
United States District Judge

13

Case 2:09-cv-00004-RLJ   Document 10   Filed 02/18/10   Page 13 of 13   PageID #: 58